*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY LAMAR BONNER,

        Defendant-Appellant.

UNPUBLISHED
April 16, 2020

No. 346460
Ingham Circuit Court
LC No. 17-000577-FC

Before: CAVANAGH, P.J., and BECKERING and GLEICHER, JJ.

PER CURIAM.

A jury convicted defendant of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b); second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b); and assault with intent to commit criminal sexual penetration, MCL 750.520g(1), for committing two acts of sexual abuse against his nine-year-old great-niece. The court sentenced defendant as a fourth habitual offender to lengthy sentences of imprisonment. On appeal, defendant raises several challenges to the trial procedures and to his sentences. Because the trial court violated defendant's constitutional right to a public trial, we reverse defendant's convictions and remand for a new trial.

## I. BACKGROUND

This case arises from the then 50-year-old defendant's sexual abuse of his then nine-year-old great-niece. The victim and her immediate family were homeless and relied on defendant for transportation and other support. The family spent a significant amount of time with defendant and regularly prepared meals at defendant's home.

In May 2017, while the victim's mother was in jail, the mother's boyfriend entrusted defendant with transporting the children to school. On the day in question, defendant took the victim's brother to school but brought the victim alone back to his house. The victim testified that defendant carried her to his bedroom, removed her pants and underwear, and performed cunnilingus on her. Defendant struck the victim across the face so hard that he left a bruise and threatened to kill her if she told anyone what he had done. Later that evening, the victim spoke to her mother on the telephone and reported defendant's assault. The conversation was recorded

-1-

through the jail's phone monitoring system. Given the family's precarious situation, the mother was hesitant to contact the police lest Child Protective Services get involved.

The following day, the mother's boyfriend contacted the police and the victim was taken to the hospital for a Sexual Assault Nurse Examination (SANE). The victim told the SANE nurse that defendant "tried to touch [her] . . . in [her] privacy parts." The victim described that defendant attempted to remove her clothes and to touch her "bare skin," but she screamed and defendant instead "rubbed" her private parts while her "clothes were on." Given the victim's description of the offense, the nurse did not swab the victim's vaginal or anal areas. Two weeks later, a forensic examiner interviewed the victim. The examiner testified that the victim was "comfortable" and "engaged" while they developed a rapport, but that she "bent over and put her face in [a] pillow" when the conversation moved to the sexual assault. The victim told the examiner that defendant touched her once, asserted for the first time that defendant had performed cunnilingus on her, and indicated that it hurt.

The prosecutor charged defendant with one count of CSC-I, with an alternative lesser included count of CSC-II, and one count of assault with intent to commit sexual penetration. While preparing for trial, the victim revealed to her mother that defendant had improperly touched her on one previous occasion. Specifically, the victim asserted that while her mother, mother's boyfriend, and her siblings slept on defendant's couch, defendant touched her chest. As a result of this new information, the prosecutor amended the charges to separate counts of CSC-I and CSC-II, along with the assault charge.

Defendant's trial spanned five days. His defense revolved around the victim's credibility and the inconsistency of the victim's statements leading up to trial. The jury convicted defendant as charged.

As will be discussed in greater detail below, the prosecution presented expert testimony from Thomas Cottrell, the vice president of counseling services at the YWCA of West Central Michigan, regarding the general behaviors of sexual abuse victims. Defendant challenges the admission of portions of Cottrell's testimony.

Defendant also challenges the trial court's decision to close the courtroom during the victim's testimony. Because the court failed to make factual findings necessary to support the closure, we must reverse defendant's conviction on this ground.

## II. EXPERT WITNESS

Defendant first contends that the trial court abused its discretion by admitting Thomas Cottrell's testimony regarding child sexual abuse and the dynamics of child sexually abusive episodes because it did not meet the relevancy and reliability requirements of MRE 702. More specifically, defendant posits that the trial court erred by the allowing the prosecutor to elicit expert testimony regarding the frequency with which children fabricate sexual abuse allegations because the testimony was irrelevant and unreliable, and it unfairly bolstered the credibility of the victim.

The parties agreed to the admission of Cottrell's testimony for the limited purpose of discussing general behaviors of child sexual abuse victims. Cottrell had not met the victim or her family and could make no judgment about the veracity of the allegations in this case. On direct

examination, Cottrell discussed the broad range of behaviors exhibited by child sexual abuse victims. He generally described the process of "progressive disclosure." It is "common," Cottrell explained, for children who have been sexually abused to slowly reveal details about the assault over time as they test the waters and build trust with others. Cottrell described various factors that impact what a child reveals, to whom, and when, and explained how trauma can fragment a child's memory of events, leading to inconsistent descriptions of the abuse. Cottrell expounded that humans "often play to our audience" as well. As a result, the details presented with each retelling of an event vary. If a child said "the exact same thing two, three, four times in a row," Cottrell "would have concerns that the story had been coached or had been rehearsed or it was a fabrication potentially."

On cross-examination, defense counsel elicited testimony from Cottrell about the suggestibility of children; Cottrell conceded that with repeated coaching from the right person, a child may "own an event as their own as if it happened when, in fact, it did not." In Cottrell's experience, however, children aged three to five are more suggestible than children of 10 to 12 years old. An older child is more likely to knowingly lie "to satisfy someone," not because he or she was convinced of the truth of the narrative.

On redirect examination, the prosecutor sought to reinforce Cottrell's earlier testimony:

*Q*. Okay. Have you come across children who fabricate in your line of work?

*A*. It's extremely rare, but, yes, I have.

*Q*. Okay. What are some . . . ways that you are able to tell when a child is fabricating?

*A*. Primarily, as I just mentioned, . . . their emotional presentation doesn't match what they're saying in terms of the emotion we would typically see. They are avoidant of going into any more detail. They speak of it in [an] extremely matter of fact way, and we also recognize for those children when we have identified that there's a secondary gain to their fabrication.

*Q*. What about we talked about progressive disclosure. Is that something that's seen when there's a fabrication or are they more consistent?

*A*. When we have witnessed fabrications, it is typically the single story, the same time. It's the same - - relatively brief disclosure and it is representative and it's close to identical every time we hear it.

Defense counsel objected that given Cottrell's limited exposure to child victims who had fabricated allegations, he lacked "sufficient data to base his facts on reliably." The court overruled the objection, stating, "He is an expert. I'm going to allow it." Cottrell went on to explain that a child giving a story predicated on suggestibility would likely be "congenial" and the disclosure would be friendly or engaging; however, a child who was emotional, avoiding the subject, or showing signs of stress could suggest either a genuine disclosure or stress related to fabrication and "knowingly lying to someone."

During closing arguments, the prosecutor contended that the jury could hold a reasonable doubt in this case if the jurors determined that the victim was intentionally lying or had adopted a narrative constructed by an adult. Cottrell's testimony, the prosecutor informed the jurors, was intended to guide them in making that determination. The prosecutor then summarized Cottrell's description of how to interpret a victim's behavior. In contrast, defense counsel argued that the victim's inconsistent statements, coupled with Cottrell's "generalities that children can do just about anything in response to just about anything," were insufficient evidence to support a conviction. Defense counsel argued that there was no physical evidence supporting the charges, and asserted the victim had either lied about penetration at the time of the SANE interview or was lying now. Defense counsel urged the jury to use "common sense" and "reasonable experiences" to conclude that "[s]omeone when they keep changing their stories, they're lying."

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). Our Supreme Court has recognized that when the credibility of the victim is attacked by the defendant, a qualified expert may offer testimony to explain the behavior of victims of child sexual abuse. See *People v Peterson*, 450 Mich 349; 537 NW2d 857 (1995). More specifically, in child sexual abuse cases, an expert may testify regarding typical symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim or to rebut an attack on the victim's credibility. *People v Thorpe*, 504 Mich 230, 258; 934 NW2d 693 (2019). Further, "the prosecution may, in commenting on the evidence adduced at trial, argue the reasonable inferences drawn from the expert's testimony and compare the expert testimony to the facts of the case." *Peterson*, 450 Mich at 373. However, an expert may not vouch for the credibility of the victim. *Id*.

In *Thorpe*, 504 Mich at 259-260, the Supreme Court found that Thomas Cottrell's testimony crossed the line into vouching for the victim's credibility. When asked by the prosecutor, Cottrell asserted "that only 2% to 4% of children lie about sexual abuse" and he identified two scenarios in which children "might lie"—when the child's sibling has been sexually abused or when there is other domestic violence in the home. *Id*. at 239-240, 259. Neither of those scenarios existed in *Thorpe*. *Id*. at 259. Accordingly, the Supreme Court concluded, "[A]lthough he did not actually say it, one might reasonably conclude on the basis of Cottrell's testimony that there was a 0% chance [the victim] had lied about sexual abuse. In so doing, Cottrell for all intents and purposes vouched for [the victim's] credibility." *Id*.

In this case, it was proper for the prosecutor to present expert testimony to assist the jury in assessing the victim's testimony because defendant's main defense was to attack the victim's credibility. The prosecution did not deliberately elicit the same problematic testimony from Cottrell in this case as it did in *Thorpe*. Rather, the prosecutor propounded an unobjectionable question: "Have you come across children who fabricate in your line of work?" Cottrell's answer, however, ("It's extremely rare, but, yes, I have") crossed the line drawn in *Thorpe*. There is no meaningful difference between a falsehood estimate of "two to four percent," Cottrell's testimony

in *Thorpe*, and his unsolicited "extremely rare" response here.[1]  Cottrell's answer was improper and it should not have been considered by the jury.

Although a close question, the admission of Cottrell's improper answer qualifies as harmless error under the circumstances presented in this case.  The prosecutor did not invite the answer Cottrell provided and did not pursue Cottrell's numeric estimation.  Rather, when Cottrell offered his "extremely rare" comment the prosecutor promptly pivoted, inquiring, "What are some . . . ways that you are able to tell when a child is fabricating?"  Cottrell's improper testimony was thereby limited and isolated.  Further, unlike in *Thorpe*, corroborating evidence was presented in this case—a visible facial bruise corresponded to the victim's testimony that defendant had struck her.  Defendant has not demonstrated that more likely than not, a different outcome would have obtained without the testimony.  See *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014) ("If the court's evidentiary error is nonconstitutional and preserved, then it is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict.") (cleaned up).[2]

## III. PUBLIC TRIAL

Defendant next contends that the trial court violated his right to a public trial by closing the courtroom during the victim's testimony and by overruling without cause its own order that the victim's testimony would be broadcast to another location in the courthouse for the public's observation.  We review de novo this constitutional challenge.  *People v Vaughn*, 491 Mich 642, 650; 821 NW2d 288 (2012).

## A. LEGAL PRINCIPLES

The Sixth Amendment to the United States Constitution and Article I, § 20 of the Michigan Constitution guarantee criminal defendants a public trial.  *Vaughn*, 491 Mich at 650.  "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions."  *Waller v Georgia*, 467 US 39, 46; 104 S Ct 2210; 81 L Ed 2d 31 (1984) (cleaned up).  "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury."  *Id.*

Nevertheless, the government may have a substantial or compelling interest in protecting young witnesses who are called to testify in cases involving allegations of sexual abuse.  *Globe Newspaper Co v Superior Court for Norfolk Co*, 457 US 596, 607; 102 S Ct 2613; 73 L Ed 2d 248

---

[1] In *People v Thorpe*, 504 Mich 230, 240; 934 NW2d 693 (2019), Cottrell used precisely the same phraseology, opining that lying about sexual abuse among children is "extremely rare."

[2] This opinion uses the new parenthetical "cleaned up" to improve readability without altering the substance of the quotation.  The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation.  See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

(1982). While "safeguarding the physical and psychological well-being of a minor" is a "compelling" interest, it does not suffice to support a "mandatory" closure rule. *Id*. 607-608 (cleaned up). Rather, the Supreme Court instructed, "[a] trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." *Id*. at 608. In a footnote, the Court added, "Absent an overriding interest *articulated in findings*, the trial of a criminal case must be open to the public." *Id*. at p 608 n 2 (cleaned up, emphasis in original).

*Globe* involved the constitutionality of a Massachusetts statute that *required* trial judges to exclude the press and general public from trials for sexual offenses involving victims under age 18. *Id*. at 598. The Supreme Court struck down the statute on First Amendment grounds. *Id*. at 610-611. The Court emphasized that its holding was "a narrow one," and that "[i]n individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public during the testimony of minor sex-offense victims." *Id*. at 611 n 27. The Court elucidated that "a mandatory rule requiring no particularized determinations in individual cases, is unconstitutional." *Id*.

Two years later, in *Waller*, 467 US at 46, the Supreme Court declared "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." The Court highlighted that "[t]he central aim of a criminal proceeding must be to try the accused fairly, and our cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant." *Id*. (cleaned up).

*Waller* arose from the closure of a courtroom during a seven-day suppression hearing involving evidence obtained through wiretaps. *Id*. at 41-42. The prosecution claimed that any "publication" of the wiretapped information would "taint" the evidence, preventing its use in future prosecutions against people involved in the intercepted conversations. *Id*. at 42. The Georgia Supreme Court upheld the closure, ruling that the trial court had properly balanced the defendants' rights to a public hearing against the privacy concerns of the other wiretapped individuals. *Id*. at 43. The United States Supreme Court reversed, holding that the Sixth Amendment right to a public trial applied to the suppression hearing, and that in closing the hearing, the trial court had "failed to give proper weight to Sixth Amendment concerns." *Id*. The Supreme Court reiterated the central requirements guiding courtroom closure set forth in earlier cases:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure. [*Id*. at 48.]

To protect the rights of child victims while still protecting the constitutional right to public trials, our Legislature adopted the following provisions in MCL 600.2163a:

> (18) If upon the motion of a party made before trial the court finds on the record that the special arrangements specified in subsection (19) are necessary to protect the welfare of the witness, the court must order those special arrangements.

In determining whether it is necessary to protect the welfare of the witness, the court must consider all of the following factors:

(a) The age of the witness.

(b) The nature of the offense or offenses.

(c) The desire of the witness or the witness's family or guardian to have the testimony taken in a room closed to the public.

(d) The physical condition of the witness.

(19) If the court determines on the record that it is necessary to protect the welfare of the witness and grants the motion made under subsection (18), the court must order 1 or more of the following:

(a) That all persons not necessary to the proceeding be excluded during the witness's testimony from the courtroom where the trial is held. *The witness's testimony must be broadcast by closed-circuit television to the public in another location out of sight of the witness.*

(b) That the courtroom be arranged so that the defendant is seated as far from the witness stand as is reasonable and not directly in front of the witness stand in order to protect the witness from directly viewing the defendant. The defendant's position must be the same for all witnesses and must be located so as to allow the defendant to hear and see all witnesses and be able to communicate with his or her attorney.

(c) That a questioner's stand or podium be used for all questioning of all witnesses by all parties and must be located in front of the witness stand. [Emphasis added.][3]

This case raises issues related to the trial court's failure to comply with both the statute and the Constitution.

## B. FACTUAL BACKGROUND

Several months before trial, the parties stipulated to special arrangements for the child's testimony drawn from MCL 600.2163a. The parties agreed:

3. The minor victim will be permitted to have a support person sit with her while she testifies at trial.

---

[3] At the time of defendant's trial, these provisions were located in MCL 600.2163a(16)-(17), as amended by 2012 PA 170. At the time of defendant's trial, MCL 600.2163a(17)(a) provided that the proceeding "shall" be broadcast.

4. That all persons not necessary to the proceeding shall be excluded during the minor victim's testimony from the courtroom where the trial is held.

5. That the minor victim's testimony shall be broadcast by closed-circuit television to the public in another location out of the sight of the witness.

6. That the courtroom shall be arranged so that the defendant is seated as far from the minor victim as is reasonable and not directly in front of the witness stand.

The trial court signed an order adopting this stipulation.

The victim's mother testified on the first day of defendant's trial; the transcript refers to the victim as "Xxxxxxx." The mother described the events that occurred after the victim revealed the sexual abuse perpetrated by defendant. The prosecutor then inquired:

> *Q.* Okay. This process has been going on for over a year; is that correct?
>
> *A.* Yes.
>
> *Q.* Okay. How has this process been for your family?
>
> *A.* It's been very trying, emotional.
>
> *Q.* Can you explain that?
>
> *A.* My daughter, she talks about suicide. She's only 10, and it just changed her a lot, so it's just hard. We never had to go through this before and . . . I wouldn't make her do this . . . if this didn't happen to her we wouldn't be doing this.
>
> *Q.* How - - Xxxxxxx knows - - Xxxxxxx is in the building today, correct?
>
> *A.* Yes.
>
> *Q.* And she knows she has to come and testify?
>
> *A.* Yes.
>
> *Q. How is she feeling this morning?*
>
> *A. She seems fine.*
>
> *Q.* Okay. [Emphasis added.]

Defense counsel began cross-examination immediately after this exchange. When counsel suggested that the witness review a telephone call and the police report, the court excused the jury and indicated that it would "take a brief break." Just before the jury reentered the courtroom, the trial court initiated the following colloquy:

> *The Court*: . . . And I understand the child is going to testify?

*[Prosecutor]*. Next, yes.

*The Court*: Okay. So how long do you anticipate that testimony will take?

*[Prosecutor]*. Direct, probably half an hour.

*The Court*: Okay. I'm wondering if we should do that after lunch, and what we need to do is block the cameras, because I'm going to close the courtroom and cameras.

*[Prosecutor]*. Judge, the court - - the statute requires the court to broadcast her testimony to another place in the courthouse, which is part of the stipulation that was signed.

*The Court*: Well, let me look at that and let me - - I'm uncomfortable having a child's testimony of this nature broadcast, seen, and I was considering closing the transcript so that we redact her name and then if anybody needs a copy of it, they receive a redacted for her privacy. She is a child who I've heard testimony who is suicidal. I'm concerned.

*[Prosecutor]*. And, Your Honor, I a hundred percent agree with the court's concerns. The citation is 600.2163A and that does permit the support person - -

The court was interrupted by the arrival of the jury in the courtroom and indicated: "We'll proceed after."

The mother resumed testifying, and a short time later the court again excused the jury after defense counsel approached the bench. Before addressing the subject of the bench conference, the court returned to the victim's anticipated appearance, ruling sua sponte that it would disregard the stipulation for close-circuit broadcast of the victim's testimony:

*The Court*: . . . [B]efore you take care of finding whatever you need to on the tape let's finish our other conversation. Read to me the - -

*[Defense Counsel]*. 600.2163A, I believe is what she cited, Your Honor.

*[Prosecutor]*. That's correct. And I'll pull up the statute for the exact subsection. It is subsection 17A.

*The Court*: Which reads as?

*[Prosecutor]*. 17 says if the court determines on the record that it is necessary to protect the welfare of the witness and grant the motion made under subsection 16, the court shall order one or more of the following: A, all persons not necessary to the proceeding shall be excluded during the witness'[s] testimony from the courtroom where the trial is held. The witness'[s] testimony shall be broadcast by closed circuit television to the public in another location out of sight of the witness.

*The Court*: Okay. So that's the testimony. We still can block out her on the cameras.

*[Prosecutor]*. Okay.

*The Court*: The testimony can be, whatever, heard wherever, I don't know, wherever this broadcast, but her name needs to be protected.

*[Prosecutor]*. Yes.

*The Court*: And I'm going to order this transcript be sealed and then any copies her name will be redacted.

*[Prosecutor]*. I appreciate that. Thank you, Your Honor.

*The Court*: Okay?

*[Prosecutor]*. Yes.

*The Court*: And all unnecessary personnel will not be in the courtroom while she testifies. Her voice being transmitted, I get that, but we're going to block the cameras.

*[Prosecutor]*. Okay.

*The Court*: This child needs to be protected, and she's suicidal, and she needs to be in a safe space so if that's wrong, I guess appeal me, but I think that is consistent with what that section says. Any objection to proceeding in this way?

*[Defense Counsel]*: Your Honor, I just want to put on the record that I do believe that the video of it would be applicable. She's been in the hallway this whole time. I don't know that we're hiding her physical identity, but just for the record for an appeal, I am going to object. I understand the court still going to do so.

*The Court*: You can object, but she's not out there testifying and nobody knows what she's doing out there. We have visitors all the time. Once she's in here and testifying, she's talking about very private things. She needs a safe place, and I'll comply with the statute about her voice being able to be heard, and that is her voice through the transcript but her name, her identity, her photograph as she's testifying will not be public. I am not going to have a suicide on my hands. She's a very tender age talking about something very private, and we're going to do what we can to have a safe space in this courtroom for everybody of every age, especially someone of tender years, so that's how we're going to proceed. Appellate court down a couple blocks, interlocutory appeal if you'd like.

So we're going to go off the record, deal with what you need to in regard to the refresh.

*[Defense Counsel]*:  Thank you, Your Honor.

*The Court*:  We're back on the record.  As to the other discussion we had, before we deal with this, I am - - because defendant will be here as the child testifies, there's no reason to broadcast it.  I'm going to do a closed courtroom and closed cameras.  Anybody else that wants a copy, I'm reading the broadcast issue that they can order a transcript redacted with the child's name from Ms. Hamlin.  I don't see any reason to broadcast this.  It's going to be a closed courtroom.

*[Prosecutor]*.  Understood.

*[Defense Counsel]*:  I understand the court's ruling.

*The Court*:  Great.  I think that's best for the health, safety, and welfare of the child, so we're going to proceed in that fashion.

The prosecution concedes on appeal that the testimony was not broadcast, but contends that "there was no less restrictive means to adequately and effectively protect [the victim's] interests."[4]

The 10-year-old victim's testimony was without incident.  The transcript reflects that she was able to answer the questions posed to her without hesitation or difficulty, and contains no indication that she struggled emotionally while doing so.

## C. ANALYSIS

Several aspects of the above-quoted proceedings bear emphasis.  Although the victim's mother testified that the victim "talks about suicide," when asked about the child's condition that morning, the mother responded, "She seems fine."  Despite that the parties had agreed that the child would have a support person with her, that the courtroom would be emptied of persons "not necessary to the proceeding," that defendant would be seated "as far from the minor victim as is reasonable," and that the victim's testimony would be "broadcast by closed-circuit television to the public in another location" outside the child's sight, the trial court decided to block the camera in addition to closing the courtroom.  The prosecutor resisted this ruling, reminding the court of the stipulation.  Although the prosecutor had heard—and elicited—the testimony motivating the trial court's decision to block the camera, the prosecutor did not request that closed-circuit access be curtailed.  The sole finding made by the court in support of its ruling was: "I'm uncomfortable having a child's testimony of this nature broadcast, seen, and I was considering closing the

---

[4] This was not the position taken by the prosecutor at the trial.  And lest there be any doubt about whether the camera was actually turned off, the transcript includes the court's statement at the outset of the victim's testimony; "Only necessary court personnel are in here and the cameras are blocked off.  Are we ready for the jury?"  Defense counsel observed that one "spectator" had been in the courtroom just before it was closed.

transcript so that we redact her name . . . . She is a child who I've heard testimony is suicidal. I'm concerned."

It was error for the court to close the courtroom while refusing to broadcast the victim's testimony to another location in the courthouse. At the time of defendant's trial, MCL 600.2163a(17)(a), as amended by 2012 PA 170, provided that if unnecessary individuals are excluded from the courtroom, "[t]he witness's testimony *shall* be broadcast by closed-circuit television to the public in another location out of sight of the witness." The statute was later amended to provide: "The witness's testimony *must* be broadcast by closed-circuit television to the public in another location out of sight of the witness." MCL 600.2163a(19)(a). "Must" and "shall" are mandatory terms. *Fradco, Inc v Mich Dep't of Treasury*, 495 Mich 104, 114; 845 NW2d 81 (2014); *Vyletel-Rivard v Rivard*, 286 Mich App 12, 25; 777 NW2d 722 (2009). The trial court did not have a choice; by closing the courtroom to the public, the court was required to broadcast the proceedings via closed-circuit television to another location in the courthouse.

The record supports that trial court *deliberately* violated the statutory closed-circuit mandate over the objections of both the prosecutor and defense counsel. Is this automatic reversible error? Or must we consider whether the error was prejudicial? No direct authority guides us on this precise question. Generally, preserved unconstitutional error (as would apply to a statutory violation) is subject to harmless error review, and the defendant bears the burden of establishing that a miscarriage of justice likely occurred. *Thorpe*, 504 Mich at 252. Defendant cannot meet that standard.[5]

However, as a result of the trial court's decision to cancel closed-circuit transmission of the victim's testimony, defendant was denied his constitutional right to a public trial.

Complete closure of a courtroom, as occurred here, may be justified under rare circumstances, and "the balance must be struck with special care." *Waller*, 467 US at 45. The Supreme Court reiterated in *Waller*:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered. [*Id*., quoting *Press-Enterprise Co v Superior Court of California, Riverside Co*, 464 US 501, 510; 104 S Ct 819; 78 L Ed 2d 629 (1984).]

Specifically, and pertinent to this case, a court must "narrowly tailor" the closure so that it is no broader than necessary, *Press-Enterprise*, 464 US at 510, and must affirmatively find and explain why reasonable alternative measures are inadequate. *Waller*, 467 US at 48. "With the scales thus tipped dramatically in favor of open proceedings, a trial court must explain in detail its reasoning

---

[5] We acknowledge the difficulty in applying this standard to a violation of a defendant's right to a public trial. It is difficult to envision how prejudice could *ever* be established, as excluding the public does not impact the presentation of evidence, and the benefit of a public trial is "intangible." *Waller*, 467 US at 49 n 9.

-12-

for closing the courtroom, including whether it considered alternative measures, and how it narrowly tailored the remedy it is imposing to achieve the specific interests it seeks to protect." *Williams v Burt*, 949 F3d 966, 975-976 (CA 6, 2020).

Here, the trial court failed to logically explain how or why the presence of a closed-circuit camera would have caused the victim emotional trauma. Several commendable steps had been taken to reduce the victim's anxiety. A support person was present next to her, and defendant was seated far from her. No persons other than necessary personnel were permitted in the courtroom. With these measures in place, we are at a loss to understand how closed-circuit transmission of the victim's testimony—which would have preserved defendant's right to a public trial—could have been harmful or threatening to the victim.[6] In short, the trial court failed to justify its decision to eliminate closed-circuit transmission of the testimony with findings supporting that its action was "essential to preserve higher values" than the defendant's right to a public trial.

In *Vaughn*, 491 Mich at 666, the Michigan Supreme Court characterized the deprivation of a public trial as a structural error. "Structural errors . . . are intrinsically harmful, without regard to their effect on the outcome, so as to require automatic reversal. Such an error necessarily renders unfair or unreliable the determining of guilt or innocence." *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000), citing *Neder v United States*, 527 US 1, 7; 119 S Ct 1827; 144 L Ed 2d 35 (1999). "[S]tructural errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Duncan*, 462 Mich at 57, citing *Rose v Clark*, 478 US 570, 577-578; 106 S Ct 3101; 92 L Ed 2d 460 (1986).

As the court denied defendant his right to a public trial, we must reverse his convictions and remand for a new trial.

Given our resolution of this issue, we need not consider defendant's claim arising from the trial court rereading the victim's testimony to the jury without first notifying defendant. We also need not consider defendant's challenges to his sentences as those sentences will be reconsidered following his new trial. Moreover, we take no position regarding defendant's judicial bias claim. On remand, defendant may pursue a motion for disqualification of the trial judge.

We reverse and remand for a new trial. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Jane M. Beckering
/s/ Elizabeth L. Gleicher

---

[6] The trial court's concern for the victim's well-being is understandable. However, the victim's mother testified that the victim seemed "fine" about being in court to testify that day. In addition to failing to articulate a logical reason for rejecting closed-circuit transmission of the victim's testimony, the record does not support that any further accommodations were necessary.